Bergan, J.
To sustain her status as the wife of the deceased employee of appellant TJ. 'S. Trucking Corporation, claimant relies on two separate grounds: that a ceremonial marriage contracted in New York was valid; and, in any event, that the parties later contracted a valid common-law marriage in Florida according to Florida law. The decision of the Workmen’s Compensation Board was that claimant was the wife of the deceased employee Herbert Farber, and thus entitled to death benefits under the Workmen’s Compensation Law.
This decision followed protracted prior litigation with varying results. The award, and the legal ground on which it was stated, by the board to be based, have been affirmed by the Appellate Division. The appeal from the unanimous final order of affirmance is here pursuant to CPLR 5601 (subd. [d]). In the decision thus finally made, only one of the grounds suggested by claimant was accepted by the board and the Appellate Division : that there had been a common-law marriage in Florida.
But claimant as a respondent is entitled to argue for the affirmance of the order in this court on both grounds. Since the facts as to the prior ceremonial marriage are entirely undisputed and are all matters of public record, the validity of that marriage is solely a question of law.
The validity of the common-law marriage in Florida depends on the legal sufficiency, according to Florida law, of the facts as found by the board to sustain a common-law marriage in that State. If the ceremonial marriage be held good, it would not be necessary to say whether the purported common-law marriage was good or bad. One showing, of a validly contracted marriage would be enough.
But if, as it happens in the division of opinion in this court, there is not a majority in favor of holding the ceremonial marriage good, it becomes necessary also to consider the alterna *48 tive, whether the common-law marriage was good in order to decide the over-all resulting question whether the order of the Appellate Division should be affirmed.
The facts relating to the ceremonial marriage are very simple. The claimant had been defendant in an action for divorce by the husband of a former marriage. Judgment went for the husband. It was entered in New York 'County March 24, 1942 and became final June 25, 1942. The marriage was thereupon dissolved, but under the statute then in effect (Domestic Delations Law, former § 8) and by the specific terms of the judgment of divorce itself, the claimant was prohibited from remarrying.
The statute at that time authorized the Supreme Court to grant permission to such a defendant to remarry upon a sufficient showing of good conduct after three years from the entry of judgment. Long after .the three-year period had elapsed, but without obtaining prior permission from the court, claimant remarried Herbert Farber, the deceased employee, on January 22,1949.
Had application for permission to remarry been made before the remarriage, and at any time after June, 1945, it would undoubtedly have been' granted routinely and as a matter of course. This was then the usual practice of the Supreme Court. The fact claimant stated in the application for a marriage license that her former husband was dead rather than divorced did not turn her into a woman of bad character. On the contrary the record as a whole suggests she is a woman of good character.
In 1966 the former statutory prohibition in section 8 on remarriage of defendants in divorce cases was amended (L. 1966, Ch. 254) to provide that “ either party ” to a divorce action “ may marry again ”, apparently on the ground that as a matter of public policy it is preferable in the case of defendants in divorce actions to encourage remarriage.
This statutory change in 1966, as it first read, of course, had no effect on the bar to remarriage which would result from a 1942 judgment. But section 8 was again amended in 1968 (L. 1968, ch. 584) to insert the clause: ‘ ‘ and whether prior or subsequent to September first, nineteen hundred sixty-seven” after the opening word “ Whenever ”.
*49 So section 8 now reads that either party to a divorce action may marry “ "Whenever ” such a judgment be granted “ and whether prior or subsequent to ” September 1, 1967. There is a heavy time emphasis in this language and on its face it accords free sanction to remarriage of divorced defendants under old judgments without regard to how long ago they were entered.
It is clear that a defendant in a divorce action where judgment was entered in 1942 prohibiting remarriage without permission of the court could, after the effective date of the 1968 statute (June 16), have remarried without at any time obtaining any judicial permission.
The amendments of 1966 and. 1968 do not, fairly viewed, retroactively eliminate the prohibition of the judgment and of the former statute effective at the time of a remarriage; but they do establish a profound change of policy in New York on the former disability to remarry imposed on a defendant in a divorce action. Thus the validity of a retroactive order of .the Supreme Court in 1961 granting permission to remarry should be viewed in the perspective of this subsequent and great change in policy.
On May 11, 1961, after the accidental death of Herbert Farber in appellant’s employment, formal application for permission to claimant to remarry n-unc pro tunc was granted by the Supreme Court effective as of the time, of the marriage in 1949. If this order is valid the ceremonial remarriage in 1949 is good.
There seems no reasonable ground to hold the order bad on this workmen’s compensation record. If the same application by the same person on the same grounds had been made in the same court in 1949 it would, as it has been noted, almost surely have been granted.
The only legal impediment to the 1949 remarriage, therefore, was the absence of a court order which under ordinary circumstances would have been granted had application been made. Relief from such a mere procedural omission seems peculiarly within the frame of ordinary judicial authority.
The only party shown to be affected by the retroactive order permitting marriage is appellant U. S. Trucking Corporation having no direct interest in the marriage relation. This appel *50 lant did apply to the 'Supreme Court to vacate the order of May 11, 1961.
Upon that application the right of claimant to .the mmc pro tunc order became a controverted issue in an adversary proceeding with the rights of appellant and claimant before the Supreme Court. The motion to vacate was denied January 22, 1962. Appellant had a right to appeal. It did not do so, and so after a controverted hearing the validity of the retroactive order of May 11, 1961 became the law of the case as between claimant and the appellant, whether it was legally correct or not, if there was jurisdiction to make the order.
Two cases in this court should be examined in evaluating the effectiveness of a nunc pro tunc order to supply omissions in procedural steps affecting marriages. The first is Merrick v. Merrick (266 N. Y. 120 [1934]); the second is Lynch v. Lynch (13 NY 2d 615).
In Merrick the Supreme Court had granted nunc pro tunc in 1933 an order permitting the wife, defendant in a divorce action in which a decree was granted in 1920, to remarry as of 1925, the time at which she had married appellant George F.. Bartlett then suing for annulment. This court held the order could not be granted (Crane, J., dissenting).
The theory of decision was the general limitation on the scope of nunc pro tunc orders, i.e., the order cannot serve to “record a fact as of a prior date when the fact did not then exist” nor can the order supply a jurisdictional defect “by requiring something to be done which has not been done” (O’Brien, J., p. 122).
In Lynch the nunc pro tunc order was sustained which did just those very things. An interlocutory judgment of divorce was entered September 23, 1958. The statute (Civ. Prac. Act, § 1176) expressly provided that the interlocutory judgment would become final as of course 1 ‘ Three months after ’ ’ its entry.
The plaintiff wife, however, under misapprehension, remarried on December 12,1958 before the judgment became final. An order was made by the Appellate Division, reversing Special Term, granting a motion to enter the interlocutory judgment nunc pro tunc as of September 12,1958 (16 A D 2d 157). There *51 were sharp dissents in that court, hut the order mmc pro tunc was affirmed here.
This case and Merrick are not readily reconcilable. If it was wrong to ‘ ‘ record a fact as of a prior date when the fact did not then exist ” (266 N. Y. 120, 122, supra) in granting retroactively permission to remarry which had not in fact then been granted, it seems just about as wrong to enter an interlocutory judgment as of September 12, 1958 which in fact had not been entered until September 23 of that year.
Thus the effect of Merrick, which turned entirely on the theoretical nature of a retroactively corrective order, must be deemed weakened by Lynch. There is in the present case, too, the additional distinguishing factor which has been noted that the employer by controverting the order in an adversary proceeding to vacate it has become bound by the final determination of the issue against it.
And on broader policy grounds, the view in New York toward remarriage by a defendant in a divorce action is rather greatly more liberal now than it was in 1934. Thus the order retroactively permitting remarriage should be sustained. In the light of the present language of section 8 this kind of question is unlikely to recur.
Therefore, the order of May 11, 1961 should be held valid; and if this result is reached the impediment to the ceremonial marriage is removed.
But if the ceremonial marriage be deemed invalid, as the Appellate Division found and as some of the Judges of this court agree, the relationship of husband and wife was sufficiently established according to the law of Florida by a common-law marriage, as the Appellate Division also found. On this question claimant is entitled to the benefit of all the favorable factual findings of the board in support of the relationship.
On this view of the facts it could be found that claimant entered into the prohibited ceremonial marriage in New York in January, 1949, apparently believing it was good, but at least evincing an intention then to enter a marital relation with the deceased employee Herbert Farber.
Some months later (August, 1949) the parties went to Florida where the claimant’s daughter was living. It was the intention of the parties then to live in Florida and of the husband to go *52 into business there. Claimant .testified she wanted to live there because “ my daughter was living there ” and “ we wanted to buy a house and that the husband wanted to go there because “ Frank Zold, his friend, said he should go in business with him ”.
Claimant’s daughter, Clara Lallas, testified that Herbert said “he wanted to live in Florida and “ He wanted to look at homes to buy a home, to settle in Florida, to go into business with Frank Zold ’ ’. When the parties went back to New York after three weeks “ Herbert said he was coming back ”.
From this, and other testimony in the same direction, it could be found that the presence of the parties in Florida in 1949 following their ceremonial marriage amounted to a more significant local attachment to that State than merely vacationers would have had, although no doubt tourists in Florida could contract a common-law marriage by conforming with the laws of that State governing such a relationship.
But, among other things, this proof of intention and acts in Florida strongly negatives meretriciousness in the relationship. It suggests, rather, a public and open avowal of a marriage and of the kind of planning and discussion often incidental to marriage.
There is additional proof of the Florida common-law marriage relationship. The daughter testified that there was a “ wedding party for my mother and Herbert ”. A number of people were there including “ Herbert’s sister ” and “We all gave gifts ’ ’. Herbert gave claimant a wrist watch and an envelope containing money and said “ that is my wedding present to my wife ”. The parties publicly occupied the same room during this period as husband and wife.
Thus the acts and the statements of the parties plainly demonstrated, not the initiation of a marriage since obviously they believed the initiation had been in the January ceremony, but a public recognition in Florida of the existence of a marriage between them by acts and statements which accepted, and confirmed that relationship. Under Florida law this seems enough to make out a common-law marriage as the Appellate Division has, held.
It is interesting to notice that Chief Justice Terrell of the Florida Supreme Court in Le Blanc v. Yawn (99 Fla. 328, 333) *53 attributed the beginning of the concept of ‘ ‘ common-law marriage ” in this country to the New York decision in Fenton v. Reed (4 Johns. 52, 4 Am. Dec. 244). He observed this type of marriage had not been recognized in the Colonies and had been abolished in England before the Revolution.
It may be helpful, then, in gaining an over-all view of the problem relating to common-law marriage when a void ceremonial marriage is followed by later confirmatory and ratifying acts accepting the marital relationship after the disability has been removed, to look at the New York law on this subject as it stood before the statute (L. 1933, ch. 606) put an end to such marriages. This in turn may aid in determining whether the board and the Appellate Division were right in deciding under the facts of this case there was a valid Florida common-law marriage.
A leading case in New York on this subject is Matter of Haffner (254 N. Y. 238 [1930]). The husband and wife entered into a ceremonial marriage in 1898 at a time when both had spouses living. In the case of the husband there was then pending an action in Germany for divorce, the judgment in which was not entered until 1901. In the case of the wife there was a void divorce entered in 1900 in favor of her former husband. The former wife of the husband died in 1924 and the former husband of the wife died in 1921.
This court assumed that the German divorce of the husband entered in 1901 was valid and ended the disability as to him; and that on the death of the wife’s husband in 1921 the disability of both parties was removed, and in all events it was removed on the death of the husband’s first wife in 1924 (pp. 240-241).
The parties had, however, from the time of the ceremonial marriage in 1898 until 1929, when the husband died, continuously lived together under the “belief that they occupied the status of legally married persons ” (p. 241). The relationship thus initiated by an invalid ceremonial marriage, but continued for comparatively few years toward the end of the husband’s life, after all disability had ended, was held sufficiently to establish a common-law marriage. ‘ ‘ The ceremonial marriage evidenced the intent of the deceased and respondent to enter into a legal and honorable .state of matrimony ” (Hubbs, J., p. 242).
*54 Other questions were presented in that case, hut it was relevant to the decision to decide if the marriage was good. The court held a valid common-law marriage arose from a relationship which started with an invalid ceremonial marriage and continued through a period after alldisability was ended.
The case thus is very similar to the problem now here. The New York disability of the wife to marry in 1949 had, as appellant concedes in this court, “ no extraterritorial effect ”. This concession is right (Fisher v. Fisher, 250 N. Y. 313) and thus there was no impediment to contracting marriage in Florida.
The law of Florida seems consistent with the rule laid down in New York in Matter of Haffner (Jones v. Jones, 119 Fla. 824). It was there held that an ‘ ‘ absolutely void ’ ’ bigamous marriage could ripen into a 1 ‘ presumptively valid common law marriage ” by continued cohabitation of the parties after the disability ceased by the death of a former spouse (p. 832). This is the theory of Haffner, and although Jones also deals with several different problems it seems reasonable to think that the former New York view and the Florida view on the effect of confirmation of a void ceremonial marriage by acts subsequent to the ending of disability are consistent with Florida law.
The Appellate Division in Matter of Weisel v. National Transp. Co. (14 A D 2d 621) analyzed the Florida law in a situation similar to the present one and concluded on the basis of J ones that the relationship did not have to have been initiated in Florida for a valid common-law marriage to be created. The analogy in principle between Jones and Haffner was noted (p. 622). The common-law marriage rule in New Jersey was similarly analyzed in Matter of Dellaca v. Hughes Constr. Co. (11 A D 2d 828), an authority on which Weisel relies.
The argument was made in Weisel, as it is by appellant here, that there must be an affirmative and expressed agreement {per verba de praesenti) initiating the common-law marriage to be valid according to Florida law. But it was held under the facts of that case the “continued cohabitation under an assumed valid but, in fact, invalid, ceremonial marriage ” was good in Florida.
This seems to be the generally accepted rule and Craddoch’s Case (310 Mass. 116), in which the Supreme Judicial Court of *55 Massachusetts construed the common-law marriage rule of Pennsylvania (p. 122), is a leading authority. There is, as the cases demonstrate, a very strong presumption favoring the marriage relationship in Florida and the recent case of In Re Estate of Alcala (188 So. 2d 903 [1966]) illustrates this.
Even when the beginning of the relationship is quite meretricious this presumption was there held to prevail to sustain the marital relation. The presumption was an important factor, too, in Le Blanc v. Yawn (99 Fla. 328, supra). Of course, the best way to establish the common-law marriage is, as the court noted, by the words of the contracting parties themselves “ per verba de praesenti, as distinguished from a ceremonial marriage ”, but if this proof is not available (in that case because of the statute prohibiting proof of transactions with a deceased) the agreement may be established by circumstances, i.e., “ general repute and cohabitation” (Terrell, Ch. J., p. 330). (See, also, Edge v. Rynearson, 107 Fla. 461, where the proof of the relationship was held insufficient; see, generally, on the origin and direction of the Florida rule Marsicano v. Marsicano, 79 Fla. 278.)
The finding by the board that the parties contracted a common-law marriage in Florida according to Florida law is, therefore, supported by substantial evidence.
This appeal was taken pursuant to CPLR 5601 (subd. [d]) from an order of the Appellate Division entered January 10, 1969 which unanimously affirmed the award of the board, and, therefore, it brings up for review only the prior order of the Appellate Division of January 3, 1966 (24 A D 2d 1047) which had reversed the earlier decision of the board.
The scope of review on such an appeal is “ only ” the nonfinal determination of the Appellate Division, i.e., that of January 3, 1966 (CPLR 5501, subd. [b]). This is why the motion for permission to appeal from the final order of affirmance at the Appellate Division was denied (23 1ST Y 2d 1010). The nonfinal order thus reviewed is not always decisive of the crucial question, even though it “necessarily affects” the final order (see First Westchester Nat. Bank v. Olsen, 19 N Y 2d 342).
Here the prior nonfinal order not only “ necessarily affects ” the final decision of unanimous affirmance, but it is decisive of it, since the critical issue of the validity of the common-law mar *56 riage was in effect decided by the order of January 3, 1966, although the matter was remitted back to the board. There is thus adequate review available of the decisive law question.
The order should be affirmed, with costs.
Chief Judge Fuld and Judges Burke, Scileppi, Breitel and Jasen concur; Judge Gibson taking no part.
Order affirmed.