[987 NYS2d 543]

Anya Ponorovskaya, Plaintiff, v Wylie Stecklow, Defendant.

Supreme Court, New York County, May 29, 2014

**APPEARANCES OF COUNSEL**

*Patricia Fersch*, New York City, for defendant.

*Kenneth Warner*, New York City, for plaintiff.

**OPINION OF THE COURT**

MATTHEW F. COOPER, J.

In 1907, the New York State Legislature enacted Domestic Relations Law § 25, which provides that a marriage is valid, even in the absence of a marriage license, if it was properly solemnized. The law remains on the books despite the fact that if Domestic Relations Law § 25 were routinely invoked it would completely undermine the statutorily prescribed process by which people in this state marry, a process which is based on the issuance, signing and filing of a marriage license.

Not only can Domestic Relations Law § 25 be read as gutting core marriage requirements in this state, but if it were to be applied the way the plaintiff in this divorce action says it should be applied, it would significantly impact the rules we have long followed in New York regarding recognition of the validity—or invalidity—of marriages performed in other jurisdictions. It is plaintiff's position that by virtue of the statute alone she and defendant must be considered legally married under New York law even though their Mexican wedding ceremony, which was performed without obtaining a marriage license, was unquestionably invalid under Mexican law. One of the intriguing questions raised by this divorce is whether the legislature, when it enacted Domestic Relations Law § 25 more than 100 years ago, could have ever conceived of, let alone intended for, the statute being used to validate a license-less marriage supposedly solemnized in what can only be described as a "pseudo-Jewish" wedding ceremony conducted at a Mexican beach resort by a New York dentist who became a Universal Life Church minister on the Internet solely for the purpose of performing weddings for friends and relatives.

It is defendant's position that the Mexican wedding was purely symbolic and without any legal effect. Contending that there was never a valid marriage to dissolve in the first place, he seeks to dismiss plaintiff's divorce proceeding on the ground that the complaint fails to state a cause of action.[1] Defendant's motion also raises issues concerning comity, choice of law, and the legal authority for Universal Life Church ministers to perform wedding ceremonies.

---

1. Defendant actually moved pursuant to CPLR 3211 (a) (2), to dismiss for lack of subject matter jurisdiction. At oral argument, however, plaintiff agreed to proceed as if the motion had been brought pursuant to CPLR 3211 (a) (7), to dismiss for failure to state a cause of action.

Facts

Plaintiff, who is a clothing designer and business owner in Manhattan, and defendant, a lawyer, began their relationship in 2004. While in Mexico for a 2009 New Year's celebration, defendant proposed to plaintiff while overlooking the Mayan ruins in Tulum. The parties subsequently planned a Mexican destination wedding at the Dreams Tulum Resort & Spa. There, according to the printed thank you card they later sent to their guests, "100 friends and family joined us for ten days in February 2010" and "lounged on the beach, shared steak sandwiches and lunch tables, and made memories that will last a lifetime." On February 18th, the couple had a wedding ceremony on the resort's beach. The ceremony was performed under a *chuppah*, a canopy under which a couple stands during a Jewish wedding. Certain Hebrew prayers were recited, vows were exchanged, and there was a glass-breaking ritual, as is customary at Jewish weddings.

Despite these traditions, the ceremony was not performed by a rabbi. Instead it was conducted by defendant's cousin, Dr. Keith Arbeitman, a dentist who lives in New York. In 2003, in order to perform a marriage for friends, he became an ordained minister of the Universal Life Church (ULC), a distinction easily achieved by paying a fee on the ULC's website.[2] Dr. Arbeitman states that he does not remember the specific website he visited and that he is unable to find any record of his ordination. However, at oral argument on the motion, plaintiff's counsel produced a certificate that he printed off the Internet certifying that Dr. Arbeitman is indeed a minister in good standing with the ULC. Likewise, during the ceremony Dr. Arbeitman told the audience, "I am an ordained minister—this will be a legal union."

In advance of the wedding, and while still at home in New York City, the parties filled out a questionnaire that Dreams Tulum Resort provides all couples planning their weddings there. The questionnaire dealt with everything from the type of ceremony that would be performed, to the choice of food to be served at the reception. The second inquiry on the questionnaire reads: "Your ceremony will be: A) Civil B) Religious/symbolic." The parties crossed out the words "civil" and

---

**2.** An Internet search of "Universal Life Church" reveals multiple websites identifying as such (*see e.g.* themonastery.org; theuniversallifechurch.org; universallifechurchministers.org; ulcseminary.org; ulchq.com).

"religious" and wrote, in capital letters, "SYMBOLIC" next to choice B.

Additionally, the parties received a pamphlet, entitled "Dreams Tulum Resort & Spa Wedding Guide 2010," which contains a section labeled "List of Legal Requirements," extensively delineating various fees, documentation and medical tests required "in order to get legally married in Tulum." At the top of this list, it states, "For symbolic ceremonies the following list is not aplicable [sic], this list is only for legal marriage." Two pages later, under the heading "Additional Information for Ceremony," it expressly states that a "religious ceremony is not legally valid" and that in order for there to be a legal marriage, "the judge must perform ceremony [sic]."

Plaintiff disavows ever having read any of the materials provided by the resort dealing with the different types of wedding ceremonies or having had any knowledge of the requirements for being legally married in Mexico. In taking this position, she claims, rather unusually, that she was only involved in certain aspects of the wedding planning, such as selecting the food and decreeing that all attendees dress in white, while defendant managed all major decisions. As a result, she asserts that only defendant was privy to the information provided by the resort, only he knew that there was a distinction between a symbolic and a legal wedding, and only he opted for the wedding to be symbolic.

Whatever plaintiff may or may not have known about the legality of her upcoming nuptials, the fact is that the wedding ceremony that ensued in no way complied with the dictates of the law of Mexico and, in particular, with the law of Quintana Roo, the Mexican state in which Tulum is located. Sections 680-682 of the Civil Code of the State of Quintana Roo, which, with a certificate of translation, is attached as an exhibit to defendant's moving papers, sets forth with great specificity the process that a couple must follow in order to legally marry there. Simply stated, the parties ignored each and every step of that process. In advance of the ceremony, they failed to submit to the office of the Civil Registry any of the extensive medical and personal documentation or pay any of the fees necessary to obtain a marriage license. The wedding ceremony itself did not include any of the required formalities, such as having the application for the marriage license read aloud or having the bride and groom identify the witnesses. And following the ceremony, the parties did not sign a wedding certificate or have their fingerprints af-

fixed thereto. Most importantly, they failed to have an officer of the Civil Registry preside over the wedding ceremony. The Civil Code of the State of Quintana Roo, at section 769 (I), states in the most unqualified terms: "When the marriage is not celebrated before an officer of the Civil Registry it is an absolute nullity."

Couples who decide to have destination weddings in Mexico or other exotic locales but wish to avoid the burdensome legal requirements that those locales may impose often opt to have a civil ceremony in New York either before or after they have their symbolic wedding. Likewise here, upon their return, the parties commenced the process of applying online for a New York marriage license. For reasons that are unclear, however, the parties never appeared at the Office of the City Clerk to complete the application, and they never obtained a marriage license or participated in any further marriage ceremony of any kind.

As might be expected, the parties express different positions when it comes to whether they regarded themselves as legally married as a result of the Mexican resort wedding. Plaintiff maintains that not only did she and defendant view themselves as married, but they held themselves out to others as being husband and wife. She annexes to her opposition papers a transcript of a New York City Civil Court proceeding from March 18, 2011 in which defendant represented plaintiff. When asked by the judge to describe his relation to the plaintiff, defendant responded, "this is my wife." Similarly, on the contract for a purchase of a cooperative apartment, defendant stated that plaintiff was his wife, and on a mortgage application, defendant checked the box indicating that he was married.

Defendant, on the other hand, while acknowledging that he and plaintiff would sometimes refer to each other as "my husband" or "my wife," states that both of them were fully aware that they were not legally married. In support of his position, he has produced copies of the parties' income tax returns for the years following the trip to Mexico as proof that the parties neither saw themselves as married nor ever held themselves out to be so. Defendant filed his returns as "single" and plaintiff filed her returns as "head of household" on behalf of herself and her son from a prior relationship. As defendant points out, plaintiff would not be entitled to file as "head of household" and receive the substantial tax benefits that go with that filing status if she were in fact married to him. In response, plaintiff, consistent with her position with regard to the materi-

als provided by the Dreams Tulum Resort, states, "I did not get involved in tax return preparation, but instead left that for him to handle." This assertion might be more convincing if the tax returns in question did not consist largely of the various schedules prepared by plaintiff's accountant relating to a business that she alone owns and operates.

Plaintiff, contending that the wedding ceremony constituted a valid marriage irrespective of the dictates of Mexican law, commenced this action for divorce on November 7, 2013. By way of the divorce action, she seeks equitable distribution of marital property and maintenance, relief she would be entitled to only if she were legally married to defendant. Plaintiff also seeks to have a constructive trust imposed on the cooperative apartment in which the parties resided. The apartment is titled in defendant's name alone but plaintiff alleges that she invested significant money and "sweat equity" in its renovation.

On January 10, 2014, defendant moved to dismiss the divorce proceeding on the ground that the parties were never married. Plaintiff opposes the motion and asserts that, at the very least, defendant must prove the invalidity of the marriage at trial as opposed to having the issue decided by motion. On March 5, 2014, the court heard extensive oral argument.

## The Parties' Contentions

Both parties recognize that the ceremony did not create a valid marriage in Mexico. Defendant, relying on principles of comity, contends that since the marriage is not valid in Mexico, it is not valid in New York. Plaintiff, however, argues that section 25 of the Domestic Relations Law nevertheless requires this court to recognize their Mexican wedding ceremony as having created a valid marriage. Section 25 states, in relevant part: "Nothing in this article contained shall be construed to render void by reason of a failure to procure a marriage license any marriage solemnized between persons of full age." According to plaintiff, in light of this section the parties need not have obtained a marriage license and need not have complied in any respect with the law of the jurisdiction where the wedding took place; so long as the marriage was solemnized in accordance with the Domestic Relations Law, the marriage is valid.

At oral argument, defendant took the position that if Domestic Relations Law § 25 applies at all in this day and age, it should be applied only to marriages performed within the State of New

York, and that marriages performed outside of New York are valid only if valid where they were performed. Plaintiff, on the other hand, essentially argues that if a marriage is valid where it was solemnized, it is valid in New York, but if it is invalid where it took place, courts must look to the laws of New York to determine whether it would nevertheless be valid here. Thus, one of the questions this court must answer is whether Domestic Relations Law § 25 is meant to apply to a marriage ceremony performed outside of New York, even when such a ceremony does not create a valid marriage under local law.

Defendant also disputes plaintiff's assertion that the marriage was properly solemnized under New York law. It is plaintiff's position that Dr. Arbeitman, as an ordained ULC minister, was authorized under article 3 of the Domestic Relations Law to officiate at the wedding. Defendant contends that the Universal Life Church is not a real religion, and, therefore, Dr. Arbeitman is not a minister or clergyman who may legally perform weddings, even in New York.

### Legal Analysis

Although plaintiff and defendant have no children in common, and thus the issue of a child's legitimacy being dependent on a valid marriage is not presented here, a great deal still hinges on whether the parties are legally married. As stated earlier, much of the relief sought by plaintiff can only be sought in an action for divorce, and it is axiomatic that an action for divorce can only lie where there is, in fact, a marriage to dissolve. To resolve the question of whether the parties are indeed legally married, the court must undertake a systematic analysis of the various issues that bear on the question. These issues, which will be discussed in order, are as follows: (1) The principle of comity; (2) The effect of the Appellate Division, Second Department's decision in *Matter of Farraj*, and its use of the Restatement (Second) of Conflict of Laws in determining the validity of a foreign jurisdiction marriage; (3) The reach and consequences of Domestic Relations Law § 25; and (4) The significance of a ULC minister having officiated the wedding ceremony in question.

### Comity

New York has long recognized that, barring public policy concerns, the validity of a marriage is determined by the laws of the state or country in which it was performed (*Matter of May*, 305 NY 486 [1953]; *Moore v Hegeman*, 92 NY 521 [1883]; *Thorp*

*v Thorp*, 90 NY 602 [1882]; *Van Voorhis v Brintnall*, 86 NY 18 [1881]). For example, in a case involving recognition of a Florida common-law marriage, a form of marriage that does not exist in New York, the Court of Appeals stated:

> "At the outset it should be said that whether decedent and respondent entered into a valid common-law marriage is to be determined according to the law of Florida and if the record at the Surrogate's Court sustains a finding of a common-law marriage, such marriage will be recognized as valid in New York." (*Matter of Watts*, 31 NY2d 491, 495 [1973], citing *Matter of Farber v U. S. Trucking Corp.*, 26 NY2d 44, 47 [1970].)

The view that a marriage's validity is a determination best left to the jurisdiction where the marriage took place was reiterated in a New York County Supreme Court case in which the late Justice Lewis Friedman wrote: "It is logical to afford to the courts of the State where the marriage is contracted the authority to decide if it is valid. That State has the most substantial contacts to the marriage contract itself" (*Brawer v Pinkins*, 164 Misc 2d 1018, 1022 [Sup Ct, NY County 1995]).

The doctrine of comity—under which this state defers to the laws of the jurisdiction where a marriage took place—has resulted in New York's recognition not only of common-law marriages (*Matter of Mott v Duncan Petroleum Trans.*, 51 NY2d 289 [1980]), but of other marriages that could not be legally entered into in New York. Most notably, principles of comity guided courts to grant recognition to same-sex marriages performed in other countries (*Martinez v County of Monroe*, 50 AD3d 189, 191 [4th Dept 2008]) and in other states (*C.M. v C.C.*, 21 Misc 3d 926 [Sup Ct, NY County 2008]) prior to the legalization of same-sex marriage in New York.

Conversely, comity has resulted in the recognition that certain marriages are not valid. In *B.S. v F.B.* (25 Misc 3d 520 [Sup Ct, Westchester County 2009]), the parties participated in a Buddhist wedding ceremony in New Mexico, but they never applied for or obtained the marriage license that was required under New Mexico law. According to the decision, "as the relationship endured and recognizing the legal infirmities of their New Mexico 'marriage ceremony,' [the parties] felt the necessity of legitimizing their status by entering into a civil union in Vermont" (*id.* at 524). When the plaintiff subsequently filed for divorce in New York, defendant brought a motion to dismiss. The court granted defendant's motion, stating:

"As a matter of comity, New York courts will generally recognize out-of-state marriages, including common-law marriages, unless barred by positive law (statute) or natural law (incest, polygamy) or where the marriage is otherwise offensive to public policy. . . .

"In the absence of a legal marriage performed in a jurisdiction that recognizes and provides for same, New York cannot grant plaintiff a divorce" (*id.* at 531-532).

The long-established rule of applying the principle of comity to recognize the validity or invalidity of marriages performed in other jurisdictions is by no means unique to New York. As is stated at 52 Am Jur 2d, Marriage § 65:

"[T]he general rule is that the validity of a marriage is determined by the law of the place where it is contracted. Thus, a marriage which is valid under the law of the state or country in which it is contracted will generally be recognized as valid. Conversely, if a marriage is invalid under the law of the place where contracted, it will generally be invalid wherever the question of its validity may arise."

Thus, by applying the general rule to the facts presented here, this court would be constrained to find that the purported marriage between the parties, a marriage which was "an absolute nullity" under Mexican law, is likewise invalid under New York law.

### Matter of Farraj

As a result of a 2010 decision from the Appellate Division, Second Department, the inquiry made here cannot end with the traditional comity analysis. The case, *Matter of Farraj* (72 AD3d 1082 [2d Dept 2010]), is one upon which plaintiff relies heavily. It involved an appeal from a decision of the Kings County Surrogate's Court in a proceeding for a compulsory accounting in which the validity of the petitioner's marital status to the decedent was at issue (*Matter of Farraj*, 23 Misc 3d 1109[A], 2009 NY Slip Op 50684[U] [Sur Ct, Kings County 2009]).

The facts of *Farraj* are as follows: Rabaa Hanash, the petitioner, and Daoud Farraj, the decedent, residents of Brooklyn, sought to have a formal Islamic marriage ceremony. Under Islamic law, marriages must be conducted at the residence of the bride's eldest male relative, which was the petitioner's brother, a resident of New Jersey. The couple ar-

ranged for an imam (an Islamic clergyman) from New York to accompany them to New Jersey and perform the ceremony. Upon the conclusion of the wedding ceremony and the signing of an Islamic marriage certificate, they immediately returned to New York for the reception. The couple never obtained a marriage license either in New Jersey or in New York. Four years later, after they had continuously lived together, continuously believed themselves to be married, and continuously held themselves out to be married, the decedent died without a will.

The validity of the couple's marriage was called into question by the decedent's son from a previous marriage in the Surrogate's Court proceeding to distribute his estate. Under New Jersey law, a marriage is not valid under any circumstances without a marriage license (NJ Stat Ann § 37:1-2). The Surrogate's Court therefore had a difficult choice: apply New Jersey law, declare the marriage void and find that the petitioner was not entitled to any of the decedent's estate; or interpret Domestic Relations Law § 25 to apply to marriages performed outside of New York, deem the marriage valid and allow her to inherit. The Surrogate's Court, affirmed by the Second Department, did the latter.

While raising similar issues, certain factual differences between *Farraj* and the instant case compel a divergent outcome. Of great significance is the fact that the petitioner and the decedent in *Farraj* were constrained by the dictates of their religion to solemnize their out-of-state marriage ceremony. As both the Surrogate and the Second Department found, the couple traveled to New Jersey solely to comply with a specific religious obligation and not for any other reason. Their imam traveled with them from New York, and the reception was held back in New York as soon as the imam completed the ceremony.

The reasons for the parties here having had their wedding in Mexico stand in stark contrast to the reasons Mr. Farraj and Ms. Hanash traveled to New Jersey. Without a doubt, plaintiff and defendant were under no obligation, religious or otherwise, to travel to Mexico for their wedding ceremony. The only impetus for having the wedding in Mexico was the sentimental value of the beach town of Tulum, where defendant had proposed to plaintiff on vacation a year earlier, along with their desire to have a wedding at a Mexican beach resort in February. They chose the site of their wedding completely of their own volition, and once there did not make any attempt to follow the local laws. In a very real sense, the parties availed themselves of

the facilities, services and hospitality of Mexico to hold a destination wedding and then completely disregarded the rules and customs of the host country.

A second difference between the situation presented in *Farraj* and that presented here involves the issue of maintaining some kind of reliable and lasting record of the purported marriage. In striving to avoid the manifest injustice that would have resulted had Ms. Hanash been denied standing as a surviving spouse of the decedent, the Surrogate's Court in *Farraj* looked to Domestic Relations Law § 25 and what it saw as the statute's "balancing of competing interests, among them the need to maintain formal records" (23 Misc 3d 1109[A], 2009 NY Slip Op 50684[U], *6 [Sur Ct, Kings County 2009]). In *Farraj*, the religious ceremony resulted in a formal document: an Islamic "Certificate of Marriage" issued by the mosque with which the imam was affiliated and signed by the decedent as "husband" and the petitioner as "wife," as well as by the imam himself. (*Id.* at *5.)

In this case there appears to be no document of any kind showing that the parties participated in a wedding ceremony, and there is certainly no certificate of marriage signed by either plaintiff, defendant or the wedding officiant. The only record of the wedding is a video, submitted as an exhibit to plaintiff's opposition papers. Although it vividly depicts the ceremony—with the participants and guests dressed in white, the couple taking their vows, the palm trees swaying, the white sand glistening, and the Black Eyed Peas' "I Gotta Feeling" playing on the soundtrack—one wonders how a video could ever serve as the type of "formal record" that the Surrogate's Court found to exist in *Farraj*.

A central focus of both the lower and the appellate courts in *Farraj* is what they referred to as the couple's "justified expectations" concerning their marriage. The Surrogate's Court's decision defines this as the "the citizens' expectations that [the] rights and obligations of marriage have attached because they have participated in a religious marriage ceremony" (*id.* at *6). In this regard, the Surrogate's Court found that the petitioner and the decedent jointly "believed themselves married, had an expectation that they were married, and believed that their marriage ceremony had resulted in a valid marriage" (*id.* at *2). Similarly, the Second Department, in affirming the Surrogate's Court, found that "[t]he petitioner and the decedent had a justified expectation that they were married, since they participated in a formal marriage ceremony in accordance with Islamic law" (*Farraj*, 72 AD3d at 1084).

By contrast, no finding can be made here that the parties either jointly or justifiably had an expectation that they were legally married as result of the Mexican ceremony. The record clearly establishes that defendant unequivocally knew both before and after the wedding that it did not constitute a valid marriage. The record also strongly indicates that plaintiff knew, or at least should have known, this as well; after all, the very same wedding guide from the Dreams Tulum Resort that plaintiff admits she used to select the food to be served at the reception stated in no uncertain terms that the type of wedding ceremony the parties planned would only be symbolic and would not give rise to a legal marriage. Plainly, if plaintiff did not know about the legal infirmities of the purported marriage, it was because she chose not to know. In any event, even if defendant was the only one to apprise himself of the requirements and the only one to understand that the parties were not legally married, that fact alone would differentiate this case from *Farraj*, where *both* parties understood themselves to be legally married.

Another factor discussed by the Surrogate's Court in finding that the petitioner and the decedent in *Farraj* had a justified expectation that they were legally married was that they held themselves out as such. Here, the evidence does not show this to have been the case. It is true that defendant referred, at least on occasions, to plaintiff as his wife—with one such occasion, disturbingly, being in response to a judge's question in court when, in his capacity as a lawyer and an officer of the court, he was representing plaintiff and her company, and another being on a mortgage application. And it is also true that plaintiff may indeed have had some gauzy notion that she and defendant were husband and wife. But any evidence of how the parties viewed their marital status or represented that status to others is trumped by defendant's production of the parties' tax returns. Those returns show that both plaintiff and defendant consistently represented to the Internal Revenue Service that they were unmarried, with defendant filing as "single" and plaintiff filing, and receiving a tax advantage, as "head of household." As the Court of Appeals has clearly announced, "[a] party to litigation may not take a position contrary to a position taken in an income tax return" (*Mahoney-Buntzman v Buntzman*, 12 NY3d 415, 422 [2009] [citations omitted]). Because plaintiff's attempts to again use delegation and inattention as an excuse are patently unpersuasive, her tax returns must be seen as

proof that neither she nor the defendant considered themselves to be legally married.

A final difference between *Farraj* and the instant case is the nature of the wedding ceremonies in which the prospective spouses participated. Central to the Appellate Division, Second Department's finding that the petitioner and the decedent had a justified expectation that they were married was that their marriage ceremony was "formal" and performed by an imam "in accordance with Islamic law." The ceremony in which the parties participated here had a good deal of pomp and circumstance, with a processional and a flower girl, and it certainly incorporated some well-known Jewish wedding conventions. But it could never be mistaken for the kind of formal ceremony that the Second Department found so compelling in *Farraj*. Among other things, there were no designated witnesses or the signing of a *ketubah*, a Jewish marriage contract that plays a central role in Jewish weddings in accordance with Talmudic law. Perhaps most importantly, the ceremony was not officiated by a serious religious figure like a rabbi or an imam, something which was given great weight in *Farraj*. The issue of ULC Internet-ordained ministers conducting weddings will be discussed below, but at this point all that need be said is that the parties did not select Dr. Arbeitman to conduct their wedding out of religious or spiritual concerns. As Dr. Arbeitman is heard to say on the video at the beginning of the ceremony, they chose him because he was plaintiff's dentist and defendant's cousin.

The considerations discussed above more than sufficiently distinguish this case from *Farraj*. While the unique facts of that case may have necessitated a detour from established principles of comity, there is no basis to do so here. There is likewise no basis to follow the Restatement (Second) of Conflict of Laws, as did the courts in *Farraj*, which at section 283 (1) states: "The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage." In citing the Restatement, which indeed runs counter to much of New York's established case law and is no way binding on New York courts, the Appellate Division, Second Department was frank that it was deviating from the "general rule" that the validity of a marriage is to be determined by the law of the jurisdiction where the marriage took place in favor of the "more flexible approach" offered by the Restatement (*Farraj*, 72 AD3d

at 1083). In the end, Restatement § 283 offered a vehicle for both the lower and the appellate courts in *Farraj* to arrive at a desired result which, under the circumstances, was fair and just.

Like the analysis employed in *Farraj*, the rationale behind Restatement § 283 is focused on expectations. The comment to section 283 states, in part:

> "Parties enter into marriage with forethought. To the extent that they think about the matter, *they would usually expect that the validity of their marriage would be determined by the local law of the state where it was contracted.* In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said that they expected the marriage to be valid.

> "The need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result. For unless these values are attained, the expectations of the parties are likely to be disappointed." (Restatement [Second] of Conflict of Laws § 283, Comment *b* [emphasis added].)

As discussed, it is clear that neither defendant nor plaintiff expected, or could have expected, that their marriage was valid in Mexico. Nothing in their papers supports a reasonable inference that they contemporaneously or subsequently expected their marriage to be valid in New York. The Restatement's formulation, which, again, is merely persuasive authority and goes against long-standing Court of Appeals precedent, appears to have been adopted to protect people like the couple in *Farraj*: people who fully and reasonably believed together as a couple that they were marrying officially and had every reason to justifiably expect that their marriage was valid. Inasmuch as the parties in this case cannot be found to have had the same reasonable beliefs and justifiable expectations concerning their marriage, there is no basis to apply either the holding in *Farraj* or Restatement § 283 to circumvent the general rule of comity. Accordingly, the validity of their marriage must be determined by applicable Mexican law and not by Domestic Relations Law § 25 or any other provision of New York law.

The Reach and Consequences of Domestic Relations Law § 25

Domestic Relations Law § 25 can be characterized as an obscure, arcane provision, one that is likely little known to judges, lawyers and legislators alike.[3] And it would undoubtedly come as a surprise to all those couples who patiently wait on the long lines at the Marriage Bureau at the Office of the City Clerk in lower Manhattan to learn that, despite the instructions they were given, a marriage license is not really a requirement for marrying after all.[4]

In order for our system of regulating and documenting marriages to function, it is a good thing indeed that few people are aware of Domestic Relations Law § 25 and its provision making the procurement of a marriage license an optional component of the marriage process. If widely applied, all New Yorkers—and the multitudes who come from other states and countries to be married here—could bypass the time and expense of the marriage license process and simply proceed to having a wedding ceremony. No one need appear in person at the office of a town or city clerk to sign the application for the marriage license. No one need provide proof of their identity or the dissolution of prior marriages. No one need pay the fee. No one need wait the 24 hours that Domestic Relations Law § 13-b requires between the time the license is issued and the marriage ceremony.

And then there is the problem of record keeping. If there is no executed marriage license—stating the date and place of the marriage, and signed by the spouses, the witnesses and the officiator—returned to the office of the clerk, the license cannot be recorded pursuant to Domestic Relations Law §§ 19 to 20-b. And without an official governmental record of the marriage, one will have difficulty proving they are married when applying

---

**3.** Article 3 of the Domestic Relations Law is entitled "Solemnization, Proof and Effect of Marriage." Central to that article is section 13 ("Marriage licenses"), which states in relevant part: "It shall be *necessary* for all persons intended to be married in New York state to obtain a marriage license from a town or city clerk in New York state" (emphasis added). Much of the rest of article 3 deals with the particulars of the issuance, use and recording of marriage licenses. It is not until midway through the very last section of the article—Domestic Relations Law § 25 ("License, when to be obtained")—where it is revealed that notwithstanding everything else set forth in the article, the failure to "procure a marriage license" will not void a properly solemnized marriage.

**4.** The website of the Office of the City Clerk, http://cityclerk.nyc.gov/html/marriage/license.shtml, gives complete instructions to people seeking to be married in New York State. In the very first section ("Introduction") it is stated: "All persons who intend to get married in New York State *must* obtain a Marriage License" (emphasis added).

for health insurance as a covered spouse or seeking Social Security benefits as a surviving spouse. Obviously, without marriage licenses there would be no workable way of knowing and proving who is married in this state.

The question remains: why Domestic Relations Law § 25 was enacted and, more importantly, why is it still on the books? As recounted in the Surrogate's Court's decision in *Matter of Farraj*, commentary from 1910—three years after Domestic Relations Law § 25 was passed—indicates the provision's purpose was to avoid " '[t]he evil resulting from invalidating marriages because of technical defects in the ceremony,' based on the experience in England under a prior statute that made such marriages absolutely void" (*Matter of Farraj*, 23 Misc 3d 1109[A], 2009 NY Slip Op 50684[U], *6 n 7 [Sur Ct, Kings County 2009], quoting Fletcher W. Battershall, The Law of Domestic Relations in the State of New York 24-25 [1910]). A more important reason lies with the role organized religion played at that time. In 1907, most weddings still took place in religious houses of worship (primarily Christian churches), with their structured, formal and public proceedings, and their established systems of parish, dioceses or congregational record keeping. In fact, marriage licenses were a relatively recent innovation, with statewide registration of marriages not having begun until 1881 at the earliest.[5] Thus, the legislature enacted Domestic Relations Law § 25 at a time when traditional religious practices continued to hold sway and governmental regulation of marriage was still relatively new. Consequently, the statute was likely meant to protect the old ways by insuring that the validity of a proper religious marriage would not be jeopardized by the failure to obtain a marriage license, a requirement that in 1907 must still have struck many legislators as a mere legal technicality.

The world, of course, has changed considerably since 1907, and marriage traditions have progressed even more. Although data is not kept as to the percentage of marriage ceremonies that are religious, as opposed to civil, even a cursory reading of the marriage announcements and the information gleaned from divorce proceedings indicates that almost as many people are now marrying in civil ceremonies. And as will be discussed, even those marriages that are religious do not necessarily take place within the confines of traditional organized religion. Whereas in 1907 a wedding in a church or a synagogue, with

---

**5.** *See* New York State Archives, Birth, Marriage, and Death Records, http://www.archives.nysed.gov/a/research/res_topics_gen_vitalstats.shtml.

the attendant formality, recognition in the community and ecclesiastical record keeping, was the norm, it is now on its way to being the exception. Thus, the basic rationale for the existence of Domestic Relations Law § 25—the need to protect the sanctity of traditional, formal religious marriages from the threat of government imposed legal requirements—is no longer relevant.

The fact that Domestic Relations Law § 25 is still the law would appear to be attributable mostly to its obscurity. While most other sections of article 3, the article of the Domestic Relations Law pertaining to the marriage process in this state, have been amended at least once over the last 50 or 75 years, Domestic Relations Law § 25 has never been amended. This suggests that the legislature simply overlooked it as a forgotten relic from an earlier time. Similarly, the statute has been rarely cited in court decisions since its enactment, and outside of *Matter of Farraj*, it has only been cited once in recent years. In that case, *Persad v Balram* (187 Misc 2d 711 [Sup Ct, Queens County 2001]), the court found that a marriage solemnized by a pandit (an ordained Hindu priest) in a two-hour formal Hindu wedding ceremony in Brooklyn, and then followed by seven years of cohabitation and the birth of a child, was not void for the parties' failure to obtain a marriage license. Significantly, there are no cases where Domestic Relations Law § 25 has been applied to a wedding ceremony conducted in a foreign country, and *Farraj* is the only case where it was applied to a marriage conducted in another state.

Whatever the reasons for the continued existence of this archaic statute, Domestic Relations Law § 25 remains the law. Still, there is a distinction between applying it to marriages entered into in New York State and extending its reach to other jurisdictions with different laws. When couples come to New York from other states and countries to be married—whether it is to enjoy the panache that comes with having a wedding in the world's capital or to be afforded the freedom to marry someone of the same sex—this state expects them to follow the law and procedures for marrying: they must submit a marriage license application, pay the requisite fees, obtain the marriage license, and then wait the required 24 hours (unless specifically waived by an order of a state supreme court justice) to have the marriage solemnized in a ceremony conducted by a legally recognized officiant. This state certainly would not countenance people coming here to wed and then marry using methods that

are antithetical to New York's laws. By the same token, it should not be permitted to then allow our citizens to travel to distant lands, fail to comply with the laws, procedures and customs of those lands, and then invoke Domestic Relations Law § 25 to excuse their noncompliance.

It is one thing to broaden Domestic Relations Law § 25 the way the Surrogate's Court and the Second Department did in *Matter of Farraj* to avoid, on a unique set of facts, the manifest injustice that would have occurred if the marriage was held to be void. It is quite another thing to extend the statute's reach to allow couples who embark on destination weddings the right to blithely ignore the clearly defined laws of a country in which they are guests and, by imposing New York law on an unwilling host, still claim the privilege of being legally married. Accordingly, Domestic Relations Law § 25 should be construed to apply to weddings that take place outside of New York State only under the most extraordinary of circumstances. As already discussed, such extraordinary circumstances are not present here.

The Legitimacy of a Universal Life Church Minister

Even if the holding in *Farraj* were to be extended far beyond its facts to permit a finding that Domestic Relations Law § 25 applies to the parties' Mexican wedding, it would still be necessary to determine whether that wedding ceremony constituted a marriage properly solemnized under New York law. Various sections of article 3 of the Domestic Relations Law set forth the requirements for how a marriage is to be solemnized.

Domestic Relations Law § 11, entitled "By whom a marriage must be solemnized," provides that in addition to judges, mayors, city magistrates, and certain other government officials, a wedding may be conducted by "[a] clergyman or minister of any religion" (Domestic Relations Law § 11 [1], [2]). Domestic Relations Law § 11 (7) states: "The term 'clergyman' or 'minister' when used in this article, shall include those defined in section two of the religious corporations law." Religious Corporations Law § 2 defines a minister as one with authority to perform "spiritual affairs" in accordance with the rules and regulations of a church, and it defines a church as either "a religious corporation created to enable its members to meet for divine worship or other religious observances" or "a congregation, society, or other assemblage of persons who are accustomed to statedly meet for divine worship or other religious observances, without having been incorporated for that purpose."

These provisions call into question whether a person like Dr. Arbeitman, the dentist/Universal Life Church minister who conducted the ceremony here, is a "clergyman" or "minister" under New York law and thus authorized to officiate at weddings. Ironically, the Appellate Division, Second Department—which decided *Matter of Farraj*, the case on which plaintiff so heavily relies—has held that weddings performed by ULC ministers are not properly solemnized and do not constitute valid marriages. In its decision in *Ranieri v Ranieri* (146 AD2d 34 [2d Dept 1989]), the Court adopted the findings of an earlier New York County Supreme Court case, *Ravenal v Ravenal* (72 Misc 2d 100, 102 [Sup Ct, NY County 1972]), to conclude that the ULC, which was incorporated in 1962 in California and has its headquarters in Modesto, California, does not have an actual "church or situs within the State of New York." Because it found that the ULC was neither an entity "created to enable its members to meet for divine worship or other religious observances" nor an "assemblage of persons who are accustomed to statedly meet for divine worship or other religious observances" within this state, the Second Department held that ULC ministers did not meet the requirements of Religious Corporations Law § 2, and in turn, Domestic Relations Law § 11. Consequently, it determined that the purported marriage between the parties was "void on the ground that it was solemnized by a minister of the ULC who was not authorized to do so under Domestic Relations Law § 11" (*Ranieri v Ranieri*, 146 AD2d 34 at 45). This, the Court explained, was the case even if "either or both parties to the marriage ceremony acted in good faith" (*id*. at 44).

For more than 25 years, *Ranieri v Ranieri* was the only pronouncement from an appellate court on the validity of marriages performed by ULC ministers. In theory, then, all marriages performed by ULC ministers in New York are invalid as not properly solemnized. Nevertheless, this type of marriage has proliferated exponentially. Last year, the Appellate Division, Third Department, in a case also involving the legality of a ULC minister to perform a wedding, reversed the lower court's finding that the marriage was invalid and remanded the matter for a determination to be made as to whether "the ULC constitutes a 'church' within the meaning of the Religious Corporations Law" (*Oswald v Oswald*, 107 AD3d 45, 48-49 [3d Dept 2013]). In so doing, the *Oswald* Court wrote, "*Ranieri* was decided a quarter-century ago, and we simply cannot presume that the belief system, structure and inner

workings of the ULC have remained static since that time" (*id.* at 47). Upon remand, the case is now pending before the Supreme Court, Washington County.

*Ranieri* and *Oswald* have broad implications for married people across the state. This court was not presented with, and was unable to find, statistics stating how many of the roughly 131,500[6] marriages performed in New York State each year are officiated by ULC ministers. According to one ULC website, it has registered over 1,500 ministers in New York; given the multitude of competing online ordination sites, there are likely thousands more. In fact, of the 34 wedding announcements that appeared in last week's Sunday New York Times, 11 of them were performed by either ULC ministers or ministers of other Internet-based "churches" (Style Section, NY Times, May 25, 2014). Needless to say, marriages performed by ULC ministers in the Second and Third Departments, as well as in the First and Fourth Departments where the courts have not weighed in, are potentially invalid or at the very least in jeopardy.

Whether the ULC is a church or not, and whatever its belief system may be, compared to other online "religions" that enable people to pay a small fee, obtain a certificate of ordination and then perform religious wedding ceremonies, it seems practically mainstream. There is, for instance, the Church of the Flying Spaghetti Monster,[7] a religious group comprised of atheists, which, upon the payment of a $20 fee, will make an online applicant a "pastafarian minister." Then there is Dudeism,[8] also referred to the Church of the Latter-Day Dude, which portends to be a religious philosophy based on the protagonist in the Coen Brothers' cult classic *The Big Lebowski*. One can be ordained online for free and be authorized to perform weddings as a Dudeist priest.

Fortunately, this court need not wade into the treacherous waters of attempting to determine what is a "real" religion and

---

**6.** In 2011, the most recent year for which statistics are available, 131,515 marriages were performed in New York State, according to the Bureau of Vital Statistics (New York State Department of Health, Vital Statistics of New York State 2011, Table 47: Marriages by County of Occurrence and Month of Ceremony, New York State 2011, available at http://www.health.ny.gov/statistics/vital_statistics/2011/table47.htm). The number of marriages performed in more recent years is likely even greater, since New York's Marriage Equality Act took effect in July 2011.

**7.** www.venganza.org.

**8.** www.dudeism.com.

what is not, something that would seem to "necessarily involve an impermissible inquiry into religious doctrine or practice" (*Rodzianko v Parish of Russian Orthodox Holy Virgin Protection Church, Inc.*, 117 AD3d 706, 707 [2d Dept 2014]). Given the finding that the general rule of comity is fully applicable to this case and that the parties' purported marriage is invalid because it was "an absolute nullity" under the law of the jurisdiction where it took place, it is not of great moment whether Dr. Arbeitman was legally entitled under New York law to solemnize the marriage. All that matters is that he was not an officer of the Civil Registry, the only officiant permitted to legally marry anybody in Quintana Roo, Mexico.

What merits some brief discussion, however, is the interplay between Domestic Relations Law § 25 and the inexorable trend toward marriages conducted by friends or relatives of a couple who have been ordained as ministers by Internet churches. The New York courts that have found a marriage valid despite the absence of a marriage license appear to have based their decisions on the great significance of a "marriage performed and solemnized in accordance with established religious ritual and practice" (*Maxwell v Maxwell*, 51 Misc 2d 687, 689 [Sup Ct, Nassau County 1966]). This significance may be trivialized when the wedding is conducted by the bride's cousin who is a Dudeist priest or the groom's college roommate who just received his ULC ordination the day of the wedding.

Getting married is a serious decision that has wide-ranging and often everlasting consequences. For this reason, among others, New York requires that prospective spouses take the time and exert the effort needed to obtain a wedding license; New York even requires that there be a 24-hour period of reflection before the couple takes their vows. It is easy to understand why couples might choose a friend or relative, rather than a judge or religious figure whom they have only just met, to play an important part in a hugely personal and momentous occasion. But to be able to dispense altogether with the legal requirements imposed by the State of New York makes the process too easy and robs it of the seriousness that is warranted in view of the responsibilities and obligations that marriage entails. With fewer and fewer marriages being performed with the attendant ritual and weight of a traditional religious practice, the reason for requiring a marriage license is that much more compelling. Domestic Relations Law § 25 is an anachronism, and its time has come to be repealed or amended.

## Conclusion

The essential fact upon which defendant's motion to dismiss is premised—that the marriage was void where it took place—is conceded. The factual basis necessary to draw the legal conclusion that New York law cannot supersede local law to validate an invalid marriage—and, in particular, that the parties neither individually nor collectively could have had a reasonable and justified expectation that they were in fact married—can be established from the papers alone. Those papers include the extensive documentary evidence discussed above and the video of the wedding ceremony itself. Thus, contrary to plaintiff's assertion, a trial or evidentiary hearing is not needed to determine defendant's motion.

Inasmuch as the parties must be found not to be legally married to one another, defendant's motion to dismiss the divorce action for failure to state a cause of action is granted. His application for an award of legal fees is denied.

As a result of the dismissal, all of plaintiff's claims for Domestic Relations Law-based relief (maintenance, equitable distribution and counsel fees) are foreclosed. She remains entitled to proceed with a claim for a constructive trust on the cooperative apartment titled in defendant's name. Plaintiff, who in accordance with New York County matrimonial practice, has not served a complaint in this action, is directed to do so within 20 days. The complaint shall set forth the allegations necessary to state a cause of action for the imposition of a constructive trust.